**In re Shirlene R. WELLS, Debtor.**

No. 10–17593 ELF.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 28, 2011.

Stanton M. Lacks, Lacks & Associates, Bensalem, PA, for Debtor.

## MEMORANDUM

ERIC L. FRANK, Bankruptcy Judge.

### I. INTRODUCTION

Shirlene R. Wells ("the Debtor") is the owner of her residence, the real property located at 180 Walton Drive, Morrisville, PA ("the Property"). The Debtor commenced the above chapter 13 bankruptcy case on September 8, 2010. On February 16, 2011, PE–NC, LLC ("PE–NC") filed a secured proof of claim ("the PE–NC Proof of Claim"), asserting that it is the holder of a note secured by a mortgage on the Property with an unpaid balance of $309,714.99 and pre-petition arrears of $137,529.12.

Presently before the court is the Debtor's objection to the PE–NC Proof of Claim ("the Objection"), filed on March 2, 2011. (*See* Bky. No. 10–17593, Doc. # 21). An evidentiary hearing on the Objection was held on July 6, 2011 and September 20, 2011 (together, "the Hearing"). At the court's request, the parties submitted post-hearing memoranda, the last of which was filed on October 24, 2011.

For the reasons set forth below, the Objection will be sustained in part, resulting in a partial disallowance of the arrears claim.[1] PE–NC's secured claim for pre-petition arrears will be allowed in the amount of $92,586.34.

### II. FINDINGS OF FACT

#### *the note, the mortgage and the first assignment thereof*

1. Since approximately 1980, the Debtor has owned the Property.
2. On August 10, 2002, the Debtor entered into a mortgage loan transaction with Cresleigh Financial Services, Inc. ("Cresleigh").
3. In the mortgage loan transaction, the Debtor executed a thirty (30) year, adjustable rate note ("the Note") in the amount of $166,000.00, repayable at an initial yearly interest rate of 6.9% and an initial monthly instalment of $1,093.28.[2]

---

1. Because the Debtor has filed a chapter 13 plan that provides for the arrears claim and does not provide for the total secured claim, I will not address the total secured claim.

2. A copy of the Note is attached to Proof of

4. The Note further provides that, commencing September 2004, the interest rate is to change every six months. The adjustable interest rate is indexed to the interbank rates known as "LIBOR." The Note provides for a minimum interest rate of 6.9% and a maximum interest rate of 13.9%.

5. In the transaction, the Debtor also executed a mortgage on the Property ("the Mortgage") in favor of Cresleigh.[3]

6. The Mortgage provides that, absent a waiver, the Debtor must make "escrow" payments to the lender for annual real estate taxes and property insurance and that the lender shall administer the escrow account in accordance with "RESPA,"[4] although the record does not reflect the extent to which the mortgagee has, in fact, accepted escrow payments and administered an escrow account since 2002.

7. The Mortgage also includes an "adjustable rate rider," with terms consistent with those of the Note.

8. On or about January 23, 2004, Cresleigh assigned the Mortgage to MorEquity, Inc. ("MorEquity"). (*See* Bky. No. 10–17953, Attachment to Proof of Claim No. 7).

---

Claim No. 2 filed in a prior bankruptcy filed by the Debtor (Bky. No. 06–10850). The Debtor does not dispute the authenticity of the Note.

3. The Mortgage is attached to the PE–NC Proof of Claim.

4. Undoubtedly, the Mortgage is referring the Real Estate Settlement and Procedures Act, 12 U.S.C. §§ 2601–2617.

5. A bankruptcy court may take judicial notice of the matters of record in the state courts within its jurisdiction. *E.g., In re Soto,* 221 B.R. 343, 347 (Bankr.E.D.Pa.1998).

### the state court foreclosure action

9. On September 30, 2005 MorEquity instituted a mortgage foreclosure action against the Debtor in the Court of Common Pleas, Bucks County ("the Foreclosure Action"). The action was docketed as No. 2005–06462.[5]

10. MorEquity obtained a judgment by default in the Foreclosure Action on December 13, 2005 and took steps to schedule a sheriff's sale of the Property.

### the Debtor's 2006 bankruptcy case

11. On March 6, 2006, the Debtor filed a chapter 13 bankruptcy case in this court, docketed at Bky. No. 06–10850 ("the 2006 Case").

12. The filing stayed a sheriff's sale of the Property scheduled in the Foreclosure Action.

13. In her initial chapter 13 plan, the Debtor proposed to pay pre-petition mortgage arrears to MorEquity and identified that amount as being $40,270.71. (*See* Bky. No. 06–10850, Doc. # 3).

14. On March 15, 2006, MorEquity filed a proof of claim ("the MorEquity 2006 Proof of Claim"), asserting that the Debtor owed pre-petition arrears of $43,432.74. (Bky. No. 06–10850, Claim No. 2).[6]

---

6. The MorEquity 2006 Proof of Claim included an attachment that itemized the arrears as follows:

| | |
|---|---|
| delinquent monthly instalments | $20,238.16 |
| late charges | 1,894.04 |
| foreclosure attorney's fees | 6,448.75 |
| delinquent real estate taxes | 14,551.55 |
| "APPR/BPO" and "accrued late fees" | 300.24 |
| **Total** | **$43,432.74** |

The delinquent monthly instalments ran from February 2005 to March 2006. The amount of the monthly instalment ranged from $1,297.40 to $1,528.62. It is not clear whether the changes in the monthly payment were caused entirely by the variable interest rate or whether there were escrow increases based on property insurance increases or real

15. On June 13, 2006, after MorEquity filed its proof of claim, the Debtor filed an amended chapter 13 plan in which she proposed to cure the pre-petition default on the Mortgage by paying the full amount of the arrears claim. The Plan stated that the Debtor would pay two (2) plan payments of $388.00 followed by fifty-eight (58) plan payments of $810.40. (Bky. No. 06–10850, Doc. # 17).

16. By order dated August 10, 2006, about five months after the filing, the court dismissed the 2006 Case.

17. When the 2006 Case was dismissed, the Debtor had paid a total of $1,120.00 to the Trustee. (*See* Bky. No. 06–10850, Doc. # 25, Chapter 13 Trustee's Final Report).[7]

### the 2006 assignment of the Mortgage from MorEquity to Private Capital Group, LLC

18. By assignment dated March 16, 2006 (the day after it filed its proof of claim in the 2006 Case), MorEquity assigned the Mortgage to Private Capital Group, LLC ("PCG"). (*See* Bky. No. 10–17593, Claim No. 7).

### the Debtor's 2007 bankruptcy case

19. On October 10, 2007, the Debtor filed another chapter 13 bankruptcy case, docketed at Bky. No. 07–15925 ("the 2007 Case").

20. The filing stayed a sheriff's sale of the Property scheduled in the Foreclosure Action.

21. In her initial chapter 13 plan, filed on the same day as her bankruptcy petition, the Debtor proposed to pay a total of $47,040.00 under the Plan (twelve (12) payments of $400.00, followed by forty-eight (48) payments of $880.00). (*See* Bky. No. 07–15925, Doc. # 5).

22. In the Plan, the Debtor proposed to pay the pre-petition mortgage arrears to MorEquity and again identified that amount as being $43,432.74 (the same amount set forth in the MorEquity 2006 Proof of Claim filed nineteen (19) months earlier).

23. In her bankruptcy Schedule D, however, while the Debtor listed MorEquity as the holder of a mortgage, she also listed "Plaza Equities" as an "assignee" of MorEquity. (Bky. No. 07–15925, Doc. # 1).

24. In her bankruptcy Schedule J and Amended Schedule J, the Debtor represented that her ongoing monthly mortgage payment was $1,611.00 per month.

25. For reasons not explained, on May 21, 2008, more than two (2) years after assigning the Mortgage to PCG and seven (7) months after the commencement of the Debtor's 2007 bankruptcy case, MorEquity filed a proof of claim ("the MorEquity 2007 Proof of Claim"). The MorEquity 2007 Proof of Claim was based upon the Mortgage and the Note, but stated that there were $0.00 in arrears and that "the Account is paid in full." (*See* Bky. No. 07–15925, Claim No. 8).

26. Thereafter, on June 11, 2008, the Debtor filed an amended chapter 13

---

estate tax increases. It is possible that the itemized monthly instalments were based solely on principal and interest payments. It is also possible that the monthly amount included escrow amounts for insurance and real estate taxes, in which case the arrears attributable to the unpaid real estate taxes may have been overstated.

7. Under the terms of the Debtor's amended chapter 13 plan, $3,207.20 should have been paid under the plan as of August 10, 2011. (2 mos. × $388.00) + (3 mos. × $810.40) = $3,207.20.

plan, reducing the plan funding from $47,040.00 to $10,900.00 ($400.00 per month for eight (8) months, followed by twenty-eight (28) payments of $275.00). (Bky. No. 07–15925, Doc. # 27).

27. On the next day, however, June 12, 2008, the court dismissed the 2007 Case on motion of the Chapter 13 Trustee. (Bky. No. 07–15925, Doc. # 31).

### the 2010 assignment of the Mortgage from PCG to Plaza Equities, LLC

28. By assignment dated July 30, 2010, PCG assigned the Mortgage to Plaza Equities, LLC ("Plaza"). (*See* Bky. No. 10–17593, Claim No. 7).

### the Debtor's present chapter 13 case

29. On September 8, 2010, the Debtor filed her current chapter 13 bankruptcy case ("the Present Case").[8]

30. The filing stayed a sheriff's sale of the Property scheduled in the Foreclosure Action.

31. In her bankruptcy Schedule D, the Debtor listed North Shore Investment, LLC ("North Shore") as the holder of a mortgage on the Property with an unpaid balance of $296,357.00 and the Tax Claim Bureau as holding a secured claim of $15,337.74.

32. North Shore is an entity that has some sort of business relationship with Plaza. (Testimony of Michael Bode).[9]

33. In her Schedules I & J, filed on September 21, 2010, the Debtor represented that her monthly income is $3,697.00, her monthly expenses are $2,893.00 and that her monthly expenses include a monthly mortgage payment of $1,611.00. (*See* Bky. No. 10–17593, Doc. # 8, Schedules I & J).[10]

34. On September 21, 2010, the Debtor filed a chapter 13 plan which proposed plan payments totaling $48,000.00 ($800.00/month × 60 mos.) for payment of the secured claims of the Tax Claim Bureau (estimated in the Plan to be $15,337.74)[11] and North Shore (estimated in the Plan to be $134,375.97). (*See* Bky. No. 10–17593, Doc. # 10).[12]

### the 2010 assignment to PE–NC

35. By assignment dated November 10, 2010, Plaza assigned the Mortgage to PE–NC. (*See* Bky. No. 10–17593, Claim No. 7).

36. PE–NC is another entity that is related Plaza. It "manages" and "works out" assets acquired by Plaza. (Testimony of Michael Bode).

### PE–NC's Proof of Claim in the Present Case

37. On February 16, 2011, PE–NC, LLC filed a secured proof of claim (again, "the PE–NC Proof of Claim") asserting that it is the holder of the Note, that the

---

8. The Hon. Diane W. Sigmund presided over both the 2006 and the 2007 bankruptcy cases. Judge Sigmund retired in 2009. When the present bankruptcy case was filed in 2010, it was assigned randomly to the docket of the undersigned judge.

9. Mr. Bode is the Managing Director of North Shore. In his testimony, Mr. Bode described Plaza and North Shore as "partners," without elaborating on the details of the partnership.

10. In her Amended Schedule J, filed on January 25, 2011, the Debtor again represented that her monthly mortgage payment is $1,611.00. (Bky. No. 10–17593, Doc # 18).

11. On April 14, 2011, the Bucks County Tax Claim Bureau filed a secured proof of claim in the amount of $15,048.62. (*See* Bky. No. 10–17593, Claim No. 9).

12. The plan does not reconcile the disparity between the plan funding and the proposed payment of claims.

Debtor may have scheduled the holder as "North Shore Inve," that the total secured claim is in the amount of $309,714.99 and that the prepetition arrears are $137,529.12. (*See* Bky. No. 10–17593, Claim No. 7).

38. Although PE–NC's Proof of Claim does not separately itemize the arrears, its itemization of the entire claim ($309,714.99) includes the following charges allegedly due on the account as of the commencement of this bankruptcy case:

| | |
|---|---|
| late charges ("accrued from prior servicer") | 7,980.94 |
| taxes paid | 10,210.00 |
| FIP insurance | 9,546.62[13] |
| IOA | 6,971.16[14] |
| corporate advances | 18.00 |
| BPO/Inspections | 835.00 |
| paid legal fees | 11,170.20[15] |

39. The arrears claimed in the PE–NC Proof of Claim do not account for $20,000.00 that PE–NC is presently holding in "suspense."

40. The $20,000.00 is derived from insurance proceeds arising from a claim under a property insurance policy on the Property.

## III. DISCUSSION

### A. The Standard for Determining the Allowance of a Proof of Claim

■ A proof of claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). If properly filed, *see* Fed. R. Bankr.P. 3001(c),[16] a proof of claim is prima facie evidence of the validity and amount of the claim, even if an objection is filed. *See* Fed. R. Bankr.P. 3001(f).[17] In other words, "if a proof of claim complies with the Rules of Court and is self-sustaining (*i.e.,* it sets forth the facts necessary to state a claim and is not self-contradictory), it is prima facie valid and the objecting party has the burden of producing evidence to refute the claim." *In re Sacko,* 394 B.R. 90, 98 (Bankr.E.D.Pa.2008). That evidence, "if believed, [must] refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173–74 (3d Cir.1992). If the objector meets that burden of production, the claimant must produce evidence to prove the validity of the claim, *id.* at 174, because "the ultimate burden of persuasion is always on the claimant," *In re Holm,* 931 F.2d 620, 623 (9th Cir.1991).

■ In connection with an objection to a proof of claim for mortgage arrears, which commonly includes numerous itemized components, I have previously held that:

- to the extent that a claim for mortgage arrears includes different components with different sources of proof, each component should be analyzed separately when applying the burden of proof principles articulated in Rule 3001(f);

13. This charge is for "forced placed insurance." (Testimony of Michael Bode). Paragraph 5 of the Mortgage requires the Debtor to maintain property insurance on the Property and authorizes the lender to obtain insurance if the Debtor fails to do so.

14. Presumably, "IOA" stands for "interest on arrears."

15. Paragraph 19 of the Mortgage provides that the Debtor may reinstate the mortgage after default by paying, *inter alia,* all expenses incurred in enforcing and protecting the lender's rights under the Mortgage, including reasonable attorney's fees.

16. Rule 3001(c) requires, subject to an exception not relevant here, that if a claim is based on a writing, the claimant attach the writing to the proof of claim.

17. Rule 3001(f) provides: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."

• Rule 3001(c)'s requirement that a claimant attach the writing on which a claim is "based" need not be read expansively to encompass all of the relevant documents that might be produced in discovery in ordinary civil litigation to support the claimant's entitlement to each component of the mortgage arrears claim, but is limited to the documents that generally give rise to the claimant's right to payment (the note and mortgage); and

• given the conservative application of the requirements of Rule 3001(c) as stated above, it is appropriate to employ an elastic approach in evaluating whether the objector has met the burden of production under Rule 3001(f).

*Sacko,* 394 B.R. at 100.

### B. Application of the Legal Standard to Determine the Allowed Amount of PE–NC's Proof of Claim

In this contested matter, the Debtor has not questioned the prima facie validity of PE–NC's proof of claim.[18] Therefore, consistent with 11 U.S.C. § 502(a) and Fed. R. Bankr.P. 3001(f), I must consider whether the Debtor has come forward with evidence sufficient to refute one or more components of the PE–NC Proof of Claim to meet her burden of production and, if so, whether PE–NC has then offered sufficient evidence to meet its burden of proof.

In her post-trial submission, the Debtor's primary argument is that PE–NC's proof of claim provides "no credible and definitive breakdown of the unpaid mortgage payment, late charges, taxes paid, legal fees, FIP insurance or IOA." (Debtor Memorandum at 2 (unpaginated)).[19] As explained below, I find that the Debtor is partially correct and, therefore, that PE–NC's proof of claim should be disallowed in part.

#### 1. *delinquent monthly instalments and late charges*

I begin my analysis by determining the amount of the pre-petition arrears attributable to delinquent monthly instalments in repayment of principal, interest and late charges.

The attachment to PE–NC's Proof of Claim indicates the mortgage account is delinquent from December 2004. At the Hearing, the Debtor testified that when she filed the 2006 Case in March 2006, she may have been as much as eighteen (18) months behind in her mortgage payments,

---

**18.** Notwithstanding that the MorEquity 2007 Proof of Claim stated the claim had been paid in full, the Debtor does not contend that the subject Mortgage has been satisfied.

**19.** In her testimony and post-hearing memorandum, the Debtor also complained that she received communications from several different companies regarding her mortgage and could not get a definitive statement as to how much she owed. The Debtor claims that, as a result of these communication difficulties, she deferred making her monthly payments until she could get some clarity regarding the status of the Mortgage.

This contention does not aid the Objection. The Debtor does not suggest that the creditor's failure to provide her with account status information excuses her obligation to make the instalment payments required by the Note and Mortgage. Nor does she cite any authority supporting such a proposition. Further, I do not find credible the Debtor's testimony that her ongoing default was caused by an uncertainty as to whom and what amount she should pay. Had the Debtor held back her monthly payments for an extended period of time for this reason, I would expect her to have segregated and saved the money for later payment to the proper holder of the mortgage. Yet, in her bankruptcy Schedule B, filed on September 21, 2011, the Debtor disclosed no savings and "cash on hand" of only $25.00. I infer that the failure to make monthly mortgage payments was caused by financial hardship rather than an intentional withholding of payment due to faulty mortgage servicing.

which would take the delinquency back to September 2004. However, the MorEquity 2006 Proof of Claim states that the delinquency commenced in February 2005.

I find that the Morequity 2006 Proof of Claim is likely more accurate than either the Debtor's recollection in 2011 of the state of her delinquency in 2006 or the claim of MorEquity's successor in interest, PE–NC. Consequently, when the Present Case was filed in September 2010, this account was delinquent for sixty-nine (69) months, from December 2004 through September 2010.

■ Because the interest rate on the Note is variable and PE–NC has not presented evidence regarding all of the interest rate and monthly instalment changes since December 2004, it is not possible to calculate precisely the additional arrears attributable to the unpaid monthly instalments in this time period. However, I am able to make a reasonable approximation of the amount of the arrears which is sufficient for present purposes.

In the absence of any evidence from the claimant regarding the application of the variable rate provision of the Note and because the claimant bears the burden of proof, I will make the assumption most favorable to the Debtor—that interest rates dropped during the period in question sufficient to lower the Debtor's monthly instalment to the "floor level" of the Note: $1,093.28.[20] Thus, in the period from December 2004 through September 2010, $75,436.32 in monthly instalments fell due (69 mos. × $1,093.28).[21] In addition, $7,543.63 in late charges accrued on the account,[22] resulting in a pre-petition delinquency of $82,979.95 attributable to delinquent monthly instalments and late charges.

### 2. unpaid real estate taxes

The next component of the arrears claim is for "unpaid taxes." In support of this charge, PE–NC produced documentary evidence showing payments made by its predecessor in interest, PCG, to various taxing authorities totaling $10,209.70 for 2008 real estate taxes on the Property. (Ex. C–9). The Debtor introduced no convincing evidence to the contrary.[23] Therefore, $10,209.70 of this component of the arrears claim will be allowed.

### 3. forced placed insurance

■ PE–NC includes a charge for FIP Insurance of $9,546.62. The Debtor introduced evidence to refute the allowability of this charge. She testified that, at all times, she has maintained property insurance on

---

**20.** Although the Debtor has indicated in her bankruptcy filings that her monthly instalment was greater than $1,093.28 for at least some of the delinquency period, *see* Findings of Fact Nos. 24, 33, on the present record, I cannot tell whether the higher monthly payment is attributable to increases in the interest rate or to an escrow component of the monthly payment. *See* n. 6, *supra*.

**21.** The initial monthly instalment under the Note was $1,093.28 based on an initial interest rate of 6.9%, which was also the "floor" interest rate. It is certainly possible that the monthly payment was higher during at least some of the period from March 2006 to September 2010, which could increase the arrears considerably. However, there is no ba-

sis in the record to quantify the amount of the missed monthly instalments with greater precision and, as stated above (due to the burden of proof), the record will be interpreted in the Debtor's favor.

**22.** The Note provides for a ten percent (10%) charge for late payments.

**23.** The Debtor presented evidence that she made certain payments to taxing authorities in 2008 totaling $6,000.32. (Ex. D–4). However, those payments were made in conjunction with an agreement to stay a county tax sale and appear to be attributable to tax year 2006, not 2008. (*See* Ex. C–9 at unpaginated p. 7, Agreement to Stay Sale).

the Property. Absent any documentary corroboration, the Debtor's testimony alone might be suspect, but it also was undisputed that the Debtor made a property insurance claim that resulted in a payment of $20,000.00 to PE–NC (or a predecessor) that is currently in "suspense." Thus, it is clear that the Debtor had a property insurance policy during at least some period of time since she defaulted on her mortgage payments.

In response, PE–NC introduced into evidence a series of Certificates of Insurance (which include the premium amounts) issued to its predecessor, PCG, for policy periods running from May 2006 through March 2010. (*See* Exs. C–7 and C–8). The evidence also demonstrates that the Debtor received a credit in 2010 when the Debtor provided Plaza with evidence that the Debtor had herself procured a homeowner's insurance policy on the Property.

After considering all of the sparse evidence presented on this topic, I consider it more likely than not that the Debtor had property insurance in place in or around 2010 and that policy resulted in the $20,000.00 insurance claim presently being held in suspense by PE–NC. However, without some further documentation verifying that the Debtor had maintained the insurance in place back to May 2006, I am not convinced, based on her testimony alone, that she had such insurance prior to 2010. Accordingly, I find that PE–NC has sustained its burden of proof and the

charges for forced placed insurance will be allowed.

#### 4. *legal expenses*

The last component of the arrears that I will address is the claim for "paid legal fees." [24] At the Hearing, PE–NC submitted a detailed written summary of the legal expenses that PE–NC and its predecessors allegedly incurred in connection with this account. (*See* Ex. C–6). The legal expenses fall into two (2) categories: (1) legal fees and costs incurred in connection with foreclosure proceedings instituted against the Property in the Bucks County Court of Common Pleas ("the Foreclosure Action") and (2) legal fees and costs incurred in connection with this bankruptcy case.[25]

The documentation submitted by PE–NC indicates that the law firm of Mancini and Associates ("Mancini") handled the foreclosure through August 2010, after which Hoegen & Associates ("Hoegen") took over the representation.

#### *the Mancini legal expenses*

PE–NC's documentary evidence establishes that PE–NC and its predecessor, PCG, paid Mancini a total of $7,356.85 for services rendered and costs incurred in the Foreclosure Action docketed as *MorEquity, Inc. v. Wells*, No. 2005–06462 (C.P. Bucks). First, on October 30, 2007, PCG paid Mancini $4,523.50. Subsequently, in October and November 2010, PE–NC made payments to Mancini totaling $2,833.35.[26]

---

**24.** The itemized amount for corporate advances is unexplained and will be disallowed. The IOA will be disallowed. *See* 11 U.S.C. § 1322(e). Because PE–NC failed to present any evidence justifying the need for inspecting a property in which the Debtor has resided continuously, the BPO/inspections charges will also be disallowed. *See Sacko,* 394 B.R. at 105–06.

**25.** Some of the legal expenses included in Ex. C–6 are for ongoing, post-petition expenses incurred in connection with this contested matter. As a result, the total amount of legal expenses set forth in Ex. C–6 ($11,356.62) exceeds the $11,170.00 set forth in PE–NC's Proof of Claim.

**26.** PE–NC paid Mancini $2,674.19 on October 27, 2010 and $159.16 on November 22, 2010.

MorEquity obtained a judgment by default on December 13, 2005. Since then, three (3) sheriff's sales have been scheduled: April 2006, October 2007 and September 2010. All three (3) sales were stayed by chapter 13 bankruptcy filings.

The PCG payment to Mancini of $4,523.50 in October 2007 was made after the stay of the second sheriff's sale. The records submitted as part of Ex. C–6 do not include any itemization of the services rendered or costs incurred in support of this payment. However, the docket in the Foreclosure Action, see n.5, *supra*, reflects that before each of two sheriff's sales that were scheduled on Mancini's "watch," Mancini advanced a $2,000.00 deposit, but later received a refund of approximately $1,200.00 after each sale was stayed. Thus, Mancini expended a net amount of $1,600.00 in out-of-pocket expenses relating to the two sheriff's sales. I estimate that Mancini advanced approximately $400.00 additional in costs related to the entry of judgment and the scheduling of the two (2) sheriff's sales, resulting in a total expenditure of $2,000.00 in costs. Consequently, the balance of the $4,523.50 payment to Mancini (*i.e.*, $2,523.50) represents attorney's fees, as opposed to costs. I find this fee to be reasonable for the services rendered in initiating the Foreclosure Action, obtaining a judgment by default, scheduling two (2) sheriff's sales and staying the sales after the Debtor's bankruptcy cases were filed.

Thus, the entire first payment to Mancini of $4,523.50 is allowable.

In October and November 2010 PE–NC two (2) payments to Mancini, the first for $2,674.19 and the second for $159.16, for a total of $2,833.35. These payments fall into two categories: (1) $250.00 in attorney's fees and $2,583.35 in reimbursement of Mancini's out-of-pocket expenses incurred in connection with the third sheriff's sale (scheduled to be held in September 2010 and stayed by the current bankruptcy case).

I find the $250.00 expense for attorney's fees to be reasonable. That amount will allowed.

As for the expenses, only some of the expenses are allowable. The allowable expenses total $1,229.30:

(1) $26.25 for the writ of execution;

(2) $300.00 for a title report update;

(3) $19.69 for mailing expenses;

(4) $849.20 for the deposit paid to the sheriff; and

(5) $34.16 for an overnight fee.

 The balance of the claimed expenses (totaling $1,354.05) will be disallowed, either because they were not actually incurred, the Debtor is not obligated to pay them under the Mortgage or they are not adequately explained or supported.[27]

The allowable legal expenses attributable to the October and November 2010 payments to Mancini total $1,479.30 ($250.00 legal fees + $1,229.30 in expenses).

---

**27.** The docket in the Foreclosure Action shows that the sheriff refunded $1,150.80 of the $2,000.00 that Mancini advanced as a deposit for the September 2010 sheriff's sale. For obvious reasons, to the extent that the sheriff's advance was refunded, such costs should not be allowed against the Debtor. PE–NC seeks allowance of $58.25 for "loan assignment recording." However, PE–NC cites nothing in the Mortgage or Note that makes the Debtor responsible for this expense. PE–NC also seeks reimbursement of $20.00 for "discontinue and end." There is no evidence in the docket of the Foreclosure Action that any aspect of the matter was discontinued and ended. The meaning of this expense is unclear. Similarly, I will disallow the claimed expense of $125.00 for "Stat NOS," the meaning of which is unexplained.

The total amount of allowable legal expenses attributable to the Mancini representation is $6,002.80.[28]

### the Hoegen legal expenses

The balance of the legal fee component of PE–NC's claim is for $3,999.77 in fees and expenses paid to Hoegen. All of these expenses were incurred post-petition and, therefore, are not part of the pre-petition arrears. However, under the Debtor's plan, and in order to satisfy the "maintenance of payments" requirement of 11 U.S.C. § 1322(b)(5), the Debtor must pay those legal expenses that the loan documents authorize the lender to shift to her. *See In re Padilla*, 389 B.R. 409, 438–39 & n. 52 (2008). It is more favorable to the Debtor to pay such post-petition legal expenses over the life of a chapter 13 plan rather than in a lump sum, as is arguably required by the Mortgage. By including the expenses in its Proof of Claim, PE–NC appears willing to accommodate the Debtor in this regard. Therefore, I will evaluate the allowability of this component of the PE–NC Proof of Claim.

My review of Hoegen's itemized bills included as part of Ex. C–6 suggests that the legal services Hoegen provided to PE–NC involved representation in connection with: (1) the Foreclosure Action and the stayed sheriff's sale; (2) the Debtor's insurance claim; (3) PE–NC's Proof of Claim; (4) the Debtor's § 341 hearing; (5) title issues with respect to the Property; (6) the assignment of the Mortgage to PE–NC; and (7) defending PE–NC's Proof of Claim against the Debtor's Objection.

On the whole, I find Hoegen's legal expenses reasonable and assessable against the Debtor under the terms of the Mortgage. I take exception only to one (1) time entry referencing work on the stayed Foreclosure Action and the time spent and costs incurred relating to the assignment of the Mortgage to PE–NC. I fail to see the necessity of spending time working on a foreclosure action that is subject to the automatic stay, and PE–NC has not pointed to any provision of the Mortgage that provides for expenses related to the assignment of the mortgage to be passed on to the mortgagor. These non-compensable matters cause me to disallow $100.00 in legal fees and $52.50 in costs. After such deductions are made, $3,847.27 in Hoegen legal expenses are allowable.

Based on the allowances and disallowances stated above, the total allowable legal expenses are $9,850.07.[29]

### 5. *insurance claim*

At the Hearing, PE–NC's witness conceded that it is holding $20,000.00 in suspense that is not reflected in its Proof of Claim. Therefore, the arrears claim will be reduced by $20,000.00.

## IV. CONCLUSION

For the reasons explained above, the Objection will be sustained in part and overruled in part. PE–NC's Proof of Claim for pre-petition mortgage arrears will be allowed in the amount of $92,586.34, calculated as follows:

| | |
|---|---|
| delinquent monthly instalments and late charges | $82,979.95 |
| unpaid real estate taxes | 10,209.70 |
| forced placed insurance | 9,546.62 |
| legal expenses | 9,850.07 |
| (suspense account) | ($20,000.00) |
| **Total Arrears** | **$92,586.34** |

The outcome of this contested matter makes it highly unlikely that the Debtor

---

28.

| | | |
|---|---|---|
| Mancini (2007 payment) | | $4,523.50 |
| Mancini (2010 payments) | | 1,479.30 |
| | **Total** | **$6,002.80** |

29.

| | | |
|---|---|---|
| Mancini | | $6,002.80 |
| Hoegen | | 3,847.27 |
| | **Total** | **$9,850.07** |

will be able to propose, confirm and perform a chapter 13 plan. The Debtor's present plan is funded at a level that is significantly less than the amount needed to pay PE–NC's allowed claim for arrears. The Debtor's filed income and expense statements (Amended Schedules I and J) suggest that the Debtor lacks the net monthly income adequately to fund a plan that will provide for a cure of the pre-petition default on the Mortgage. Further, the Debtor's difficulties in this case must be considered against the backdrop of two (2) prior, failed chapter 13 bankruptcy cases as well as a sustained period in which the Debtor has not made monthly mortgage payments.

A hearing is presently scheduled on January 10, 2012 to consider confirmation of the Debtor's (presently unconfirmable) chapter 13 plan and the Chapter 13 Trustee's Motion to Dismiss this case. In order to avoid dismissal at that hearing, the Debtor will need to make a showing that she is able to propose a feasible chapter 13 plan that is confirmable in the immediate future.

### ORDER

**AND NOW,** upon consideration of the Debtor's Objection to the Proof of Claim of PE–NC, LLC, and after a hearing, and for the reasons stated in the accompanying Memorandum,

It is hereby **ORDERED** that:

1. The Objection is **SUSTAINED IN PART AND OVERRULED IN PART.**
2. PE–NC LLC's Proof of Claim (Claim No. 7) is **ALLOWED** as a secured claim for pre-petition mortgage arrears in the amount of $92,586.34.